One exception for now, but we'll proceed with the cases. The first case is Dane v. UnitedHealthcare. Good morning, Your Honors. May it please the Court. If I may, I'd like to begin by talking about a threshold issue in this case with regard to the application of the Filed Rate Doctrine. The underlying issue is whether the First Amendment complaint plausibly alleges that the payment to AHRQ out of its members' monthly insurance premiums was in exchange for AHRQ sponsoring UnitedHealth as the insurance carrier in violation of Connecticut's anti-rebating statute. And I hope to get to defendants' premature and fact-based challenges that the payment was instead for AHRQ's intellectual property instead of sponsorship. I'd like to first begin with the Filed Rate Doctrine, which this Court has spoken about with regard to application of the Filed Rate Doctrine in cases raising New York State claims involving insurance premiums approved by the New York State Department of Insurance. And it's noted that New York courts have routinely applied the Filed Rate Doctrine in New York cases. This is a Connecticut case involving Connecticut insurance law, and there are no comparable Connecticut decisions. In fact, there are no Connecticut appellate decisions at all applying the Filed Rate Doctrine. And so this case, which involves Connecticut insurance law, is appropriate, we believe, to have the question certified to the Connecticut Supreme Court on whether the Filed Rate Doctrine should apply. There is an insurance commissioner in Connecticut, and the insurance commissioner in Connecticut does approve rates. Absolutely. But the question about whether or not the Filed Rate Doctrine... Right. And you can't sell it for less either. Right. And we're not challenging... Why doesn't that amount to the Filed Rate Doctrine under another name? We're not arguing that the rate should be altered. We're arguing about a piece of the payment, the cut out of members' monthly payments. And whether or not they're allowed to do that, the question of whether or not the Filed Rate Doctrine... Why do you want that? You want that so that the rate that is paid by your clients, everybody who has this Medigap, that the rates are less. The primary objective of this case is not to lower the rates, but to stop ART from taking a payment of the rates. In fact, even if the Filed Rate Doctrine... If you make, in your brief, you make the argument that the Filed Rate Doctrine doesn't apply because, in any event, the money, the rate that is charged, would not necessarily be reduced by this. You make this argument, and that seems a plausible argument against the Filed Rate Doctrine, but doesn't that argument destroy your last argument? Doesn't that mean, then, that there's no ascertainable loss? I mean, I don't see how you can argue both, that this isn't subject to the Filed Rate Doctrine because the rate will remain the same after, and then say that you've suffered a loss because you don't get any money, because you would get a discount. Can you explain to me? So, ascertainable loss under the Connecticut Unfair Trade Practices Act does not have to prove actual damages. I know you don't have to prove actual damages, but you have to prove something. I mean, you don't have to prove them exactly, but you have to prove something, and if you've told us that the charges would be exactly the same, then how can you say that you would have gotten something? Ascertainable loss means that what was received is different from what was bargained for, and what was bargained for here was insurance coverage in exchange for... But if you bargained for something, then it isn't a material... How is it material to your case? I mean, for all of these things, you have to have something that is a material. What they did not bargain for was to be part of this anti-rebating scheme. They were paying a legally charged fee. Look, I make a deal with somebody, and I don't bargain about how they're going to use the money. And then they use the money that they have a right to use in a way that I haven't bargained for. Are you saying that's a violation of the Connecticut law? That seems a bit strange. I mean, it would mean that in every contract, I would have to know whatever anybody else was going to do with it, even if it didn't affect me. What they contracted for was paying for insurance coverage and legitimate expenses, and what they did not bargain for was to be part of basically paying... What was that? The other part of the harm is that this 4.9% cut added every insurance monthly payment was going to ARRP instead of where it could go, which is back into the assets of the plan. Again, if it can go anywhere, because 75% is the only amount that needs to be dealt with, then where is their... I don't know. I'm still puzzled. Let's go on. Before you run out of time, on the other question, you say it's a factual question, but I don't really see any dispute in the facts, and so it seems to me it's really a legal question of whether these undisputed facts fit within the coverage of the anti-rebate statute. Our allegation is that UnitedHealth is paying millions of dollars a year as an inducement to insurance so that ARRP will be the group sponsor, which provides massive market share to UnitedHealth to be the insurance carrier. We've called that in the agreement, both the original agreement, which called it an allowance, and the subsequent agreement called it a royalty. Is that an inducement to the insurance to buy these policies? No. The inducement to insurance is an inducement to ARRP. To the group policyholder. That's the argument? That's the argument, and it's supported by the New York Department of Financial Services Office of Legal Counsel Opinions, the Kinder Opinion, and, in fact, in the language of the statute, it talks about... The statute is not limited to individuals, but no person shall receive or accept an inducement, and person is defined under the law, and that includes corporations, associations, business interests. ARRP members don't have to buy this, right? They can buy some other policy. That's right. But by paying this amount of money to ARRP, ARRP has the power... You're not arguing that the individual policyholders are being induced by this? No. No, the argument is that ARRP is being induced to be the group sponsor, and the factual dispute is that the defendants refuse to admit, even despite the language, that the money is for group sponsorship. They insist it's only for licensing, and that licensing of the intellectual property. Why should inducing a company to be a group sponsor, why should that fit within the anti-rebate statute, the purpose of the anti-rebate statute? Because one of the purposes of the anti-rebate statute is to prevent huge companies having monopolies, spending, being able to use their financial power in order to gain market share, which is exactly what happened here, that UnitedHealth is paying millions of dollars to get ARRP to agree that UnitedHealth can be the insurance carrier. And if that's allowed, then it's basically the green light for companies to demand money from insurance companies, can call whatever they want, can call it a license, which they insist it's a license, not a sponsorship, which I think is telling, the fact that defendants refuse to admit that this is a sponsorship because to do that would admit that it's an inducement, and they insist licensing and sponsorship is the same thing. Number one, it's a fact question, whether or not the money is really being paid for sponsorship. And secondly, the agreement itself talks about sponsorship and licensing. Thank you. Wouldn't you say, if I may, surely the Connecticut Insurance Commissioner knows about this arrangement. That's not on the record. I mean, in fact... I understand. Well, in fact... We live in the world. Defendants are still insisting that this royalty is only for legitimate expenses related to their licensing. So we're arguing that in fact it's for the sponsorship. So the fact that even defendants refuse to admit this, it's not clear what the Commissioner knows. Nothing in the record suggests that they're aware of the royalty or the cut. There's a difference between giving millions of dollars for the use of somebody's logo and giving millions of dollars for a celebrity endorsement. I mean, a celebrity says, I love this Medigap policy, and you should too. The difference here is they're not paying for legitimate expenses. Perhaps logos would be legitimate. It's a fact question. What they're paying for... A logo and a celebrity. We're not talking about a celebrity. We're talking about the group policyholder agreeing to have UnitedHealth be the insurance carrier. That is a... It's a kickback to ARP to agree to use UnitedHealth as their carrier. But in terms of the policyholder, there's really no impact. The impact is that money is going to ARP instead of into the assets of the plan, which is to strafing the rates of the stabilization fund. And... Thank you. Thank you. Morning, Your Honors. May it please the Court. Megan Bergow for the defendants. This is a conventional licensing relationship between United and AARP that's been around for over 20 years. United uses the AARP brand to market a Medicare-related insurance... Why is that a factual question? I mean, the other side is arguing it's not, really. The other side attaches the agreement to its complaint, so the existence of the agreement, at least in its duration, is in the dismissal record. But let me start with the question whether there are facts in dispute here that matter. The plaintiffs are asserting an unprecedented application of the premium rebate statutes to dismantle this economic relationship in a way that no case has ever permitted before. And the threshold question to determine whether the premium rebate statutes apply at all is whether the payment induces insurance. That's the first question. Whether you ask whether the payment is legitimate, whether you inquire whether the intellectual property has been appropriately valued by the royalty that United, in an arm's-length agreement, has agreed to pay... It's whether it induces insurance? It's whether it induces insurance. That's the language of the statute. Induces who to buy? Well, so, the Connecticut statute actually defines insurance. 38A1 of the Connecticut Code explains what insurance is. I'm going to paraphrase, because it's long. Any agreement to pay a sum of money upon the happening of an occurrence in exchange for consideration. That's the contract here with individual insured. United's agreement to pay money upon the happening of an event in exchange for consideration is United's agreement with individual insured here to accept premiums in exchange for Medigap coverage. Here, of course, plaintiff got the coverage that he wanted. But before you even get to the question whether United has defensively agreed to pay this portion of premiums under this intellectual property license or whether the agreement can be cast as something else, you have to ask, could it even be a premium rebate in the first place? The Kinder case that plaintiffs rely on, in particular in the reply, involved an instance in which the commissioner there alleged that the payment for services had the effect of discounting the association's own premiums. It's hard to tell from the case that the parties have brought to the court's attention, but there was an earlier appeal in that case that set forth the allegations of the insurance commissioner there, and in particular his allegation that the payment to the associations had the effect of reducing their own premiums. You don't have that here. Suppose we were to hold that this payment could not be made. What would happen then? I'm very glad you asked, Judge Calabresi, because then the parties could have the identical economic relationship but they'd have to offer it through an individual policy and in that event, the insurance would be more expensive because United would be unable to aggregate the risks, the premiums would be subject to a lower loss ratio minimum, and it would have the effect of harming insurance. The group policy here really has no difference to the mechanism of insurance purchase. All it does is permit the pooling of risk and the offering of premiums. They are arguing that this contract is different from the one that they had before them. I'm trying to figure out if there is a difference, if there is in or if there is not, but if it makes any difference, any possible difference to them, because if it doesn't make any possible difference to them, I don't see what will suit them. I sincerely don't understand the difference that it makes here that an affiliate of AARP serves as the group policy holder. Under Plaintiff's version of facts, under ours, United is paying for the cost of community that AARP members feel for the AARP brand. But at all times, it's the AARP members who have to decide for themselves whether to purchase the insurance. AARP, Inc. is the seller of the intellectual property. AARP, Inc. is the owner of the marks in the membership list, in particular, that United uses. Who is the shareholder of AARP, Inc.? It's a nonprofit. The members ultimately benefit from the activities of AARP, Inc. So the money is spent... I mean, you know, the money here is spent to fund AARP's nonprofit mission. That's where it ultimately goes. But it's not unlawful for nonprofits to license their IP, and paid endorsements are explicitly permitted. Are there other organizations that do this, the American Garden Club or the NRA or anybody? There are. Yeah, I don't have... It's not in the record. Yeah, no, I think it is not an uncommon way for nonprofits to generate revenue to license marks. And if you go to the AARP website, you'll see that the AARP brand is attached to a variety of products that are of interest to seniors, whether it's life insurance or other non-insurance-related... Yes, but if you get into what is the value of that and is it a royalty or is it not, then you're starting to look like a factory. That's right, but you don't get there until you've plausibly alleged that there's an inducement of insurance. That's right. You don't get to that next-order question until you evaluate whether the premiums have been discounted. In every single case and every single law review article and every single treatise that looks at the premium rebate statutes analyzes it from the perspective of whether the premiums have, in fact, been discounted. I'll turn to the court's permission briefly to the injury, the question of injury, which it appears the court understands whether you approach the question from the perspective of the filed-rate doctrine or from the concept of the requirement in Connecticut law that the plaintiff allege an ascertainable loss of money or property or whether you approach it from the perspective of the Medigap regulation's explicit prescription of premium rebates that have the effect of discounting Medigap insurance below the filed rate, you get to the same place. The plaintiff here bargained for Medigap insurance at a price that he selected out of all the options in a competitive market, and he undisputedly received that. He remains in that insurance program today, and judicially noticeable materials that United submitted below establish that his plan is the cheapest that he could get in Connecticut. It's a great insurance program. Your adversary argued that there's no such thing as a filed-rate doctrine in Connecticut, which would be surprising. Where would we look to find out if there was one or not? Look, I think there's no sign that there's not a filed-rate doctrine in Connecticut. Connecticut obviously is a jurisdiction that grapples with insurance-related disputes all the time. When the issue has been raised with courts within Connecticut, they've acknowledged it. So in the Lentini decision, in the Accordia decision, those are state court decisions where the courts indicated that in an appropriate case they could apply the doctrine. It's true that no courts have... But there is no Connecticut case holding that directly. That's right. There's no Connecticut case directly holding... What about the notion of certifying it? I think it would be a waste of the state court's time here where ascertainable loss principles get you to the exact same place. This is not a... It takes three years, I think, to certify something. I think we would be very... This is the 10th action in which a challenge to the royalty has been asserted. On some ground, I think this is the fourth theory. This court dealt with a different theory in the Ruth Stein case about 10 years ago. We're eager to conclude it. It would have to be determinative of the case, and there are many other issues in this case in which it could go apart from the specific question of whether... That's exactly right. In this case, it is not the question that will make or break plaintiff's complaint. It breaks on considerable additional grounds, and for that reason we'd ask the panel to affirm the decision below. Thank you. We'll hear the rebuttal. With regard to Connecticut and the solid rate doctrine, one case which defended cytochordia, which was a lower court decision that stated that the solid rate doctrine may apply. Connecticut's Supreme Court reversed the judgment in that case against the insurance broker in a footnote drop that it chose not to apply the solid rate doctrine. To decide whether or not the solid rate doctrine... There's no law in Connecticut on that. There's no law. And even if the solid rate doctrine applied, I just want to note that we would still be entitled to injunctive relief because all we're asking for is to stop the payment to ARP. And with regard to the rebating statutes applying to a policyholder, the Kinder case in California did talk about that there's no inducement to insurance in that case because it found that there were legitimate expenses to the policyholder and it was not a scam. And here we allege that there was a scam, that they failed to disclose that they were paying this 4.9% to ARP in order for them to be the group's sponsor. And with regard to ascertainable harm... Why does that make it a scam? I mean, they didn't disclose... I mean, they're arguing they did disclose in the advertisement, but let's assume that you're right, that they didn't disclose this. What difference does it make? And if it doesn't make a difference, why is it a scam? Again, I keep coming back to the fact that in any number of contracts, there are any number of things that one of the parties doesn't say because it doesn't make any difference. Well, first, we'd have to get to whether or not this is a violation of the Unfair Trade Practices Act. It wouldn't be any contract. It would be a contract where there was something illegal that was happening. Why is it a violation of an act, of an Unfair Practices Act, if nothing that is done is unfair? Unfair just because you don't like it, but that doesn't make it unfair. So if the court finds that it's an inducement to insurance, that it's basically an illegal kickback for them to agree to be the group policyholder for this insurance carrier, not because they have the best rates, but because they're getting this money, then it's – and they do not disclose that. They say, no, actually, it's a royalty for ARB's marks. That's misleading. It's a misrepresentation. We say that their contract is a ruse and that the harm here is that the insurers are paying money, they think, just for coverage. But, in fact, what they're paying for is this illegal rebate. And the money, instead of going to ARB, should be going back into the plan, assets into the plan, as a favorable experience expense to stabilize the plan for all of its members. So, in a nutshell, what is the release that you want and what does your standing concede? The release is, most importantly, injunctive release to stop payments to ARB for at least 4.9 percent out of every – And you're standing to seek that? Is it what? It's an ascertainable loss. They're not getting the benefit of the bargain under the – And then your clients would pay less for insurance? Not necessarily. They would pay the same amount. They would pay the same amount. The money would go into the – You would get a rebate. They would not get the rebate. I think it's paragraph 81 in the complaint. Okay. You finally said something. You said maybe the plan would be more secure if it kept that money in it. On the other hand, under the 75 percent rule, there is nothing that would keep them from taking that money and simply putting it in their pocket or spending it, as we often do in Connecticut, a very good prosecco. There's a limit to how much – There's a limit to how much they – I think it's 1.8 percent they can take for profit, and the rest they could spend for legitimate expenses and then put the rest of the money into the plan as a favorable experience. Thank you. We have your argument. Full reserve decision. The next case is United States v. Santos. I'll just wait a second and let the folks in the back rearrange. You seem to be losing your audience. Oh, you're gaining some. Don't take it personally. All right. Go ahead. Thank you. Good morning, Your Honors. Devin McLaughlin for Appellant Peter Santos. If I may, I would like to start with the sentencing argument because I think it has the best chance of hopefully giving him some immediate relief. As the Court is aware, under the guidelines, there is a provision that goes ahead and gives a four-point reduction if the offense involves a single instance with little or no deliberation. Here, Judge Thompson found that and held that there was – that this deduction did not apply to Mr. Santos and didn't give him the benefit of it, and from our perspective, Judge Thompson was wrong. Is it a single instance making a threat or a single instance – or does it have to be more than one instance of making a threat to the same person? I'm sorry. So a single instance, it's the offense of – the operative part is offense. So the offense involved a single instance. Here, the offense charge was the threat against the PO, so at least in this context, it was that single threat, which is now being construed under the guidelines. The alleged second threat was not made directly to the PO. It was made to the marshals. It was basically, from our perspective, an amplification of what he had previously said to the PO when he's asked by the marshals escorting him, you know, you need to calm down, that was dumb to say, and then he made the second comment seconds later. Why is the second comment not repetition? From our perspective, it is repetition, Your Honor. So single instance has been consistently interpreted by other circuits to be broader than single threat, and so you can have threat one, threat two if it's in the same episode. You're saying here is somebody who got excited in a particular situation and did something. It may have been one thing or another, but it was not anything more than one instance of madness, bad behavior, whatever. Correct. Correct. And the courts have been consistent in looking at this word single instance. It doesn't say single threat with little or no deliberation. It says single instance, and they interpret that as a single episode, and they look at temporal proximity, how close is all the action together, and is he talking about the same thing? And here we submit it's clear that these are obviously in temporal proximity. They're within seconds of each other, and he's talking about the same thing. In fact, he's responding to a question or comment about his prior comment. So any way you slice it from our perspective, that has to be considered a single episode. And there are multiple cases talking about time lapse. One of the cases, an hour goes between when the first statement was made and when the second statement was made. So there's no sensical way to say, well, if you say it twice, that's going to become more than a single instance. I can just think if you say, you know, I'm going to hit you, and then no, really, I mean it, I'm going to hit you. You know, the fact that you say it twice doesn't turn one instance into two. There's evidence that this wasn't like an impulsive thing. He had talked about it earlier. He repeated it. It didn't seem like an impulsive thing. So it would seem that this was the enhancement would apply because it wasn't a single impulse. So from our perspective, Your Honor, that goes to the second prong, which is deliberation, focusing on whether it was a single impulse. And from our perspective, the evidence is such that there's nothing to support it other than a single impulse. In Wright-Darrisoff, thankfully, and Judge Galbraith was part of the panel, this court laid out the inquiry that we're going to have in terms of deliberation. Here, obviously, Judge Thompson misinterpreted that. He was asking, is the person under control? Is the person ranting and raving? That's not what it is. Deliberation is planning or doing something to try to carry out the threat. And here, in terms of planning, we don't have any of the indicia that you end up seeing in the other cases. I mean, that indicia goes from maybe finding the address, putting a postage stamp, doing that kind of stuff. In Russell, it's walking from Alabama to Georgia. You have some conduct that will support planning. And under Wright-Darrisoff, only if the defendant's course of conduct leading up to and following the time the threat was made is closely tied to the communication of the threat or if we made any effort to go ahead and carry it out. Here, ironically, I mean, we kind of have the perfect model or hypothetical, frankly, or exam question, as far as I'm concerned, because he doesn't go to the P.O.'s office. It's not like he goes to the P.O.'s house. He's in court addressing and dealing with the court proceedings that are going to send him to additional jail time. He never addresses the P.O. at all until he's escorted out by the marshals, and then he makes the comment for which he's convicted. And then within seconds, he amplifies that comment. So the notion that there's any evidence of deliberation or planning, frankly, Your Honor, we submit that there is none. The government points to two prior statements he made to his mother in phone calls, which basically indicated he didn't like his P.O. You know, go ask yourself to the P.O. and another comment along those lines. We submit that the fact that he doesn't like his P.O., which is probably present in almost any threatening case where you don't like the person, those kind of statements are not what deliberation is intended to be under the Wright-Darrisaw case. I'm thinking of Sanders. So Sanders is the Ninth Circuit case where the gentleman went ahead and sent racist letters to certain ethnic groups. Clearly, that person probably had all sorts of prior statements about his feelings vis-à-vis those ethnic groups, but the court appropriately focused on, did he have to go to the post office, did he have to sit down, did he have to take time to write these, et cetera. I can't think of a more archetypal example of a single impulse of somebody having just gotten agitated with Judge Arterton being escorted out, blurted out this one statement, and then, you know, by the time he gets to the elevator, amplifies on that statement, and I submit there is no indicia consistent with the Wright-Darrisaw analysis that we're going to find that that's deliberation. In terms of remedy, I just want to briefly touch on remedy, and one of the frustrating parts about this, from our perspective, is that every additional day that passes is a day that he shouldn't be in jail. Without the four-level... Here's my problem. If we agree with you that this was a single impulsive act, then we would send it back for resentencing, because it is possible for... We say you were wrong in taking these four into account. They shouldn't have been there, so resentence. But it has to be resentenced. Now, by the time we do that, your client is out of jail. So the effect of it would be to say he should have been in jail a few days later, or some time later, if a new sentence is different from the old one. So let me be quite clear. I am inclined to agree with you. I was on the panel with Dennis, and I'm inclined to agree with you that this was a single impulsive act. But I have a little problem with knowing what we do about it. And, Your Honor, your collective wisdom is much broader than mine, obviously. I mean, I have seen some cases where if the panel unanimously feels consistent with where you may be inclined, that this was incorrect, rather than holding it up for the decision that would explain that to the world in the future, there would be an immediate remand with instructions that, A, he should be released on appropriate conditions of release pending sentencing, B, there should be a resentencing, and C, a suggestion that... Well, but if the resentencing comes out with the same sentence, then what happens then? He gets put back in jail, then? That's a risk he's willing to take, Your Honor. I know it's frustrating because he's within four or five months of release on the 41-month sentence, but the 21 to 27 range passed nine months ago, and so I understand the dilemma. That's why I'm asking. Thank you. You're welcome. Is he a candidate for early release? Good behavior, whatever it is. When is he scheduled to be released? July, I suppose. So I don't have an answer to that. I know I was talking to a prosecutor earlier who works in that district, and he was kind enough to go ahead and talk to me about the logistics of that. I expect, and I think the government will go ahead and affirm this, insofar as he's not yet released, you know, at 36 months on a 41-month sentence, I'm expecting that his behavior in jail has probably not entitled him to, he's not even in a halfway house, which typically one would be eligible for during this time period. But, again, the government may have more insight into that. Thank you. Thank you. We'll hear from the government. Good morning. May it please the Court. My name is Mark Silverman. I represent the government in this field. Starting with one particular question that came up at the end, the anticipated Bureau of Prisons release date for Mr. Santos is May 9th, 2020. As counsel indicated, there may have been some behavioral problems. When I checked with the Bureau of Prisons yesterday, there were three disciplinary tickets issued, two for drug offenses and one for an assault. So to Judge Calabresi's point earlier, if he were inclined to agree that there was a single impulsive act, how that would actually work in practice. I think there's actually a risk that were this to go back to Judge Thompson, he may, out of plenary resentencing, considering all of the circumstances as the defendant stood before him, he may think a longer sentence is appropriate. Now, obviously I don't know that, but there is a risk. Well, but they're saying that they're willing to take that risk. So, sure, that would be the risk. So let me then respond. Yes, sure. Absolutely. So he may decide that a non-guideline sentence is now warranted and go upward either by departure or variance from that 21 and 27-month range. Did he make that decision? I'm sorry? Did he make that decision? Absolutely. Absolutely. And if the defendant is inclined to take that risk, then I should turn to the merits of the sentencing challenge. I understand from Judge Calabresi's representation earlier, he tends to think this is a single impulse. But I wanted to respond to something. I'm just saying I'm inclined. I understood you. Understood, Your Honor. Counsel suggested that he couldn't think of a better example of something that would be a single impulse, and I wanted to try and meet that challenge. So if Probation Officer Topper had given his position, the probation officer's position, at the violation hearing, just as transpired, and said, we don't think that Mr. Santos is ready to take advantage at this time of substance abuse treatment. We think he ought to be remanded. If Mr. Santos had at that moment, and for the first time ever, had a negative interaction and said, hey, Topper, I thought you were supposed to have my back. I'm coming for you. If he did it in that moment. Look, I don't doubt that there are things which could be even more single-minded and impulsive than this one. He was already unhappy with the probation officer. But what evidence is there that he would have done anything until he gets to court, and Judge Arterton, who is famous for being sensitive to drug people, she set up the special drug court. To his surprise, says, no, you're going to jail. And at that point, he explodes. Why isn't that exactly what we're talking about when we say something of this sort? Now, there may be an even more dramatic, but why isn't that enough? And, essentially, what we had in Dermatul. So, it may be that the court decides our situation is close enough to that scenario and that there was some procedural error here. I understand that. I guess one thing I would say is, you mentioned Judge Calabresi's surprise, but Judge Arterton had warned Mr. Santos on August 16th, when she saw him for a compliance hearing, that if he failed to enroll in and successfully complete an inpatient detoxification program, she was going to sentence him to six months of imprisonment, followed by two additional years of supervised release. So, maybe he went into the August 31st proceeding with the hope that it wouldn't turn out that way, but he certainly shouldn't have been... What are the repetitive acts in the government's view? Yes, Your Honor. So, the repetitive act really has to do with the meet-our-maker statement. So, in court, as he's being escorted out of the courtroom after Judge Arterton has left the bench, he makes his comment along the lines of, I'm coming for you, to the probation officer. He's escorted out of the courtroom, down the hallway, down another hallway to the elevator, the marshals are making efforts to talk with him, and then he says, you know, we've all got to meet our maker, whether it's by me or someone else. It may be that you decide that's all part of one episode. I understand that. But there is time that elapses, and Judge Thompson, in his role... Just a few minutes. Is this the time it took to walk through the hallway to the elevator? Right. I'm not claiming this is hours. It could also be one minute. I mean, how long does it take to walk to an elevator? Right. Well, so the record isn't entirely clear on this issue, and if the court were to remand, I think Judge Thompson would have an opportunity to revisit his factual finding. But what's the evidence of planning or some effort to carry out the threat? I mean, the following day, the only thing he ever did about the threat is to call his mother and ask her to apologize to the parole officer. I don't think there's any evidence that he tried to execute the threat, that he tried to carry it out. In terms of planning, though, and whether this was a knee-jerk reaction, I guess what I would say is we have a pattern here that sets up Mr. Santos for thinking about this well in advance of August 31st. So on August 25th, he's arrested for the violation of supervised release, and he's brought before Magistrate Judge Richardson in the Hartford Courthouse. When that proceeding ends and he's remanded to custody, much to his chagrin, Officer Topper comes up to him, and this is all in the record of Officer Topper's testimony at the trial. Officer Topper says, tries to engage him in conversation, and Mr. Santos says, just give me this six months and go F yourself. And then in two recorded calls with his mother following that, he repeats that vulgarity. He uses the full vulgarity, and he says, I told my PO to go F himself, and I'm going to fight these mother F'ers until I die. Clearly he's very unhappy with the probation officer, and he knows he might be getting this six-month sentence when he shows up on August 31st. Judge Richardson has already warned him of that. But is that planning in any sort, or is that just a statement of a general background of somebody who is, I mean, you know, obviously this is a very troubled and troubling person, but how is that, what is this there for? Is it to deal with people who have planned something, or is it there of people who have been unhappy for some time? I understand Your Honor's question, and emotional knee-jerk reactions, when there's no planning ahead of time and when there's no attempt to execute or repeat the threat afterwards, are the sort of instances that this reduction is meant for. And so if this court decides that the circumstances here are close enough to that, then it should find a procedural error and it should revamp. I guess what I'm proposing to the court is that there's really two things that distinguish our circumstances here from what I would view as a prototypical threatening statement that falls under the auspices of this reduction. The first is the context beforehand. There's everything that happens on August 25th, the recorded calls on the 27th and the 29th, and then the fact that Officer Topper makes his position and the probation officer's position clear. Many transcript pages before Mr. Santos has his outburst. In fact, during that period of time, as Judge Thompson found, Mr. Santos is still well under control. He's making nuanced arguments with the judge. As he sees that things aren't going his way, he starts to get more agitated, and the dialogue he engages in with Judge Arnerton is nuanced. He's still talking about the fact that this time he's not high as a kite. He's been in custody for seven days, and he'll be able to take advantage of another detox program the way he hasn't been able to on seven previous occasions. So he's still making his pitch, and he's making it in a way that's not just emotional. It's not just impulsive. He's still making an argument. Well, doesn't that just mean that when he exploded, he exploded? And that's an explosive episode, and it lasted possibly two full minutes while he's walking to the elevator. That could be, Your Honor. That's certainly one way of looking at it. But another way of thinking about it is Mr. Santos has in his head, well, if Judge Arnerton goes Officer Topper's way, that's it for me and him. That's really it. But where do we see any evidence that he has that in his head rather than, as you have described it, somebody who is being logical, is arguing, is unhappy, and so on, but is all ultimately, I mean, you almost made the argument for him by saying he was under control. Judge Calabresi, I guess what I would say is it's always difficult for the government to put on evidence of exactly what's in someone's head. It's even difficult for judges. Absolutely. But Judge Thompson, in his role as fact finder, looked at the same record and drew a factual finding. It may be one that you wouldn't have drawn yourself if you were serving in that role, but this is a clear error standard. So if it's a reasonable interpretation of the facts, it's not clearly erroneous. If someone could rationally find that that's what happened, given all of the context here, then there's no clear error with respect to the factual finding. You're arguing that he had a continuing long-term hostility to his parole officer, but the relationship is fraught. It's like a landlord-tenant, cat and dog. The relationship is set up as having an adversarial and emotional pitch to it. So the fact that he didn't like him before or uses an obscenity, I mean, I wouldn't be surprised if the obscenities are used by probation officers themselves. I understand your point, Judge Jacobson. Let me put it another way that you may note. You don't like your torts teacher because he's not a very pleasant person, and you've been in that class, and then one day he calls on you and you say something, and the teacher said, Mr. Silverman, you couldn't be longer, and at that point you explode and say something. Yes, Your Honor. I understand the points that all of you have made, and I think if you disagree which of Thompson's factual findings the appropriate remedy would be to decide there was a procedural error and to remand for a resentencing. Obviously, I would disagree that Mr. Santos should be released. I think there's a protocol in place for how that proceeds under statute, but you could direct Judge Thompson to proceed expeditiously with that resentencing. And what is the protocol that inhibits us from doing that? I don't know that there's one that would prohibit you, but there would be findings that would have to be made with respect to whether he posed a risk of flight or a danger to the community or others under the Bail Reform Act. Given the circumstances here about a threat that Officer Topper took seriously, I would think that a judge would have to make careful findings about the danger he might pose to others. Now, I guess just quickly, and I see that I've run over my time already, I understand that the court may be open to remanding for resentencing. If I could just say briefly that the government, if there were any questions with respect to the sufficiency challenge or the evidentiary challenge, I'm happy to meet them. And I would ask this court to affirm the judgment. Thank you. Thank you. We'll hear the rebuttal. Quickly, Your Honors, because, frankly, you've given better hypotheticals than I have and better examples than I have. So, just, I was... It's not the clear error issue. I mean, why shouldn't we defer to Judge Thompson's factual finding that this was deliberate and repetitive? As the Second Circuit, as Your Honors have addressed, when a question is a mixed question of law and fact, if it is primarily a legal question, then we're going to use a de novo review. And here, the notion that these facts are kind of in any way, shape, or form disputed, they're not. We know what he said. We know he walked to the elevator. We know what he said then. I'm not disputing any of the judge's findings, but the judge found that he wasn't ranting and raving and that he repeated it. And so that fact pattern exists. It's a question of law whether that fits within the guideline or doesn't fit within the guideline. And trying to continually characterize it as a finding of fact, frankly, I fundamentally disagree on that. It's an application and interpretation of a guideline case. Passage of time. The passage of time, in other words, the government started with, well, Topar had testified earlier, and so there was a passage of time. That's just pure speculation as to what's going on in his mind. Did Mr. Topar testify that he then took the threat seriously or that he feared for himself or his family? At trial, in terms of the offense of conviction, yes. And so it's a true threat, yes. And this sentencing argument accepts that it was a true threat. But trying to fill the right derison notion of planning into a passage of time between a reason why he would be angry and then doing something would erase any definition of planning. And finally, because you started with this in terms of multiple threats, the Freeman case, First Circuit, talks about a single instance connotes temporal relationship and single purpose or scheme. These are both directed towards Topar. They happen very close together. And I think more fundamentally and more fairly, his second comment was in response to somebody saying what you just said was dumb, and then he responds to it. That's a very high interconnectedness between them. Thank you. Thank you very much. Thank you. Well argued by both sides. Thank you. We'll reserve the session. We'll hear the next case, Blue City v. Five Bars. Good morning, Your Honors. May it please the Court, my name is Mark Basile. I'm here on behalf of the appellant defendant in this action. What Your Honors have before you is an appeal that really raises five new nominal issues, a case of first impression dealing with 160-year-old statutory law in New York State dealing with the usury laws. You realize that the same issue was raised to another panel of this court a few weeks ago, and so that we are bound to follow what the decision of that court is if it reaches the merits of what you are arguing today. Well, if Your Honors are aware that we have renewed our motion for certification of these questions to the New York Court of Appeals because in this case the criminal usury statute represents a fundamental public policy of New York State, and based on the issues that are raised on this occasion... I was on the earlier panel and the same argument was made. Yes, but the motion panel denied it without prejudice to bring it before Your Honors. A threshold issue... We don't get there, though, if we agree that you waive the argument or that you waive the defense. That's correct, Your Honor. I was about to address that, Your Honor. We believe that under the current statutory framework of the criminal usury statute, as well as the decisions of some of the appellate division courts in New York, that the criminal statute cannot be waived. And the reason why it cannot be waived, unlike civil usury... Civil usury is a personal right. That statute can be waived by an individual. But when a statute is created for the protection and betterment of society, especially the criminal usury statute in New York, that cannot be waived. And it must be waived in terms of you can't, in a contract, waive the statute. But what about in the context of a lawsuit? I mean, can you go throughout an entire litigation, not raise the defense, and then at the very end raise the defense? Well, Your Honor, that's not what happens here. It wasn't the entire lawsuit, but you let the motion for summary judgment be filed. They raised the issue. You totally ignored it in your response, and then later on you tried to raise it, and the district court said that you waived it. Your Honor, the defense of criminal usury was preserved in the answer. It was raised as an affirmative defense. We were not counseled during the first summary judgment motion. Had I been counseled, I absolutely would have raised that issue. Well, which way did that cut? Excuse me? Which way did that cut? Well, if you'd been counseled, you absolutely would have raised the issue, and the reason you absolutely would have raised the issue is because otherwise you would be in danger of waiving it. Well, I don't necessarily agree with that, Your Honor. There are a series of cases at the state court level that, for instance, in Moore Equities, there was a pleading, an answer, a motion of summary judgment. It wasn't raised at all in that case. Seven years later, a new attorney makes an application to vacate the motion for summary judgment, and the sole reason is because the defendant at that time, seven years later, raised the defense of criminal usury. You're surely not arguing that a summing is waivable. It has to be waived for a period of years. Oh, all of this is really measured in terms of the amount of input and work that busy judges have to give to decide a case that you have set before them, and if you don't raise an issue, they aren't going to address it. I completely understand Your Honor's position. However, the court is required to conduct a balancing act at this point. Now, let's assume for the moment that it could have been raised before and was not. This is not a jurisdictional question, so if we wanted to, since it's a straight legal issue, we could take it up even though you didn't raise it. This isn't forfeiture. This is waiver. That's correct, Judge Calabresi. In fact, the lower court, in her decision, in one instance says you waive the defense of criminal usury because you did not bring it up in the first motion of summary judgment, and then went on, in her opinion, for five pages to address the criminal usury issue, the substance of the issue itself. Could the district court itself have ignored the waiver if it wanted to? Well, we say, as a matter of fact, Your Honor, it actually... Yeah, I know you say it did, but suppose... My question is a different one. It's essentially this, that if the district court, in making its decision as to whether there was waiver or not, was influenced in a determinative way by its finding that there was no usury defense, then we don't know what the district court would have done on waiver if it had had a different view of the usury defense, in which case there is an issue that the district court could have decided differently. That's absolutely correct, Your Honor. But because this issue deals with New York's fundamental public policy and it's based on statute, I implore the court to consider certifying the question to New York State Court of Appeals. Let the New York Court of Appeals come down on interpreting their statutes and whether or not a defendant in a civil action can waive... Yeah, but the question... The fact that this is an open question in New York, and that even the second question as to whether criminal usury is void or not, on which there is one decision of the appellate division which says that it is void, but there's nothing by the Court of Appeals, so that even that isn't completely clear, sooner or later is going to have to be raised, get to the New York Court of Appeals. The question is, is this the case to do it in, or is this not? This is absolutely the case to do it in, because not only do we have that threshold question on whether or not a defendant in a civil action can waive the defense of criminal usury, but, Your Honors, you have at least 50 cases pending in both the East and Southern District, almost based on this identical... There's one case pending before another panel in a couple of weeks. Yes, in fact, Your Honor, I'm on another one that's soon to be scheduled as well. But... And the history is so rich in New York on the criminal usury statute, long before you gentlemen were born. And looking at the case below, there was no examination of the transaction document. This is developed in the brief that the Court relied on the Beaufort case, which was just dicta, and almost every Southern District Court judge has relied on that dicta to say, as a matter of law, a convertible note is not subject to usury law. But district judges have been unanimous in saying that this isn't usury, essentially. Federal district judges... This particular convertible note, so far. But that may or may not... I mean, that issue has to really be brought up to the Court of Appeals to decide. Because, in this case, paragraph 5 of the transaction... We're over your time. We'll hear from the other side. I'm sorry. We're out of time. Thank you. Good morning, Your Honors. May it please the Court. Jeffrey Flesch on behalf of the Appellee Booth City LLC. The defendants would have the Court believe this is a very unique, very important case that's going to decide dozens and dozens of cases that are pending in the circuit. The fact is, the arguments made by the defendants were overwhelmingly raised for the first time either on appeal or were waived by the defendants by virtue of their failure to raise them in opposition to summary judgment when we made the motion the first time. The fact is, this is a regular, ordinary default under a notary and SPA between two sophisticated parties. The appellant is a publicly traded company. They knew exactly what they were doing when they entered into the transaction. They offered almost no defense when we initially moved for summary judgment. And what they're really trying to do is obtain a facto absolution from this Court for their procedural errors. To address one point that the appellant made in their argument, what they're saying is that the defense of criminal usury can never, ever be waived. In essence, what they're arguing is, they can come, a judgment could be entered, they can come back five years, ten years, twenty years later and say, usury, void the judgment because usury can never be waived. That's an absurd proposition. It's basically unprecedented as far as I know. There's absolutely no way that any court that I'm aware of would agree that a defense can never, ever be waived twenty years later. Yeah, but what about the notion that the district court, in deciding this case, was influenced on whether there was waiver or not, and whether it would decide the issue in any event by its position, which it made very clear that the usury defense is not a valid one. And that position is one as to which the New York courts have not spoke. So, Judge Caproni actually covered all the bases. Judge Caproni said, A, there's a waiver. Your motion to vacate me five or six months after I issued my previous order, you waived all your arguments. But even if you hadn't waived your arguments. It said law of the case, which is a different thing, but it... Okay. But at the end of the day, Judge Caproni actually did an analysis. She went through the note, she went through the provisions, and she said, it's not usury, it's A, because the convertible discount feature is not necessarily, you know, who says that in six months or... She decided the merits. She decided the merits. Exactly right. So, for them to say they decided the merits, why aren't the merits before us? In order to overturn Judge Caproni's decision, I think this court would have to find that her decision to follow the law of the case was an abuse of discretion. It's not an abuse of discretion. She did follow... Yeah, but we don't have to follow the law of the case. You see, there's a difference between waiver and the law of the case. And law of the case doesn't bind us. Correct. Correct. But it is absolutely true that in response to our first motion for summary judgment, they made almost no arguments with respect to the usury, which is sort of the gut of their appeal here. Didn't she also... I believe that she did. I think she specifically said that there was both waiver and the law of the case. And then she said, but even if it's not, let's go through the analysis and get it wrong anyhow. So, to answer a question that was asked earlier to opposing counsel, it's possible that at some point this court will certify these questions to the Court of Appeals, but this is not the case. This is the case where they lost it on procedure. To overturn that, it would basically... Either to overturn either the law of the case or the abuse of the... I'm sorry, or the waiver argument made by the lower court, you would have to find an abuse of discretion. It certainly wasn't an abuse of discretion for Judge Capone to say, you never raised these arguments in the first place. I don't need to address them. I am going to address them, but I certainly don't need to. That's not an abuse of discretion. I'm happy to answer any further questions. I just think that... Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Because Judge Capone spent five pages analyzing the validity... Judges do it all the time. I understand. They do an alternative basis in case they get reversed on the first part. And they want to have a backup. It doesn't in any way, I don't think, undermine the analysis on the first part. Well, her analysis was flawed from the get-go, Your Honors. She relied on a case which was solely dicta in the Beaufort case. It was a simple informational passage in a case that said... Well, no, we're talking about whether she was wrong or right on the waiver issue. The other issue is an open question. So why was she wrong on deciding? I mean, there was a judge of the district court whose name was Palmieri who was known as the irreversible Judge Palmieri because he always decided cases on 12 different grounds. And if any one of them was good, the Court of Appeals would affirm. Now, Judge Capone didn't do that, but didn't she do two separate grounds? Yes, she had basically two separate rulings dealing with the criminal usury statute. Do you agree that's an abuse of discretion on her part? I believe it's an abuse of discretion because... Why is it an abuse of discretion? I'll tell you why, Your Honors, because in this court in 1914, in the Inouye Grand Union case, said that when you deal with... She spent time on that first motion, deciding the motion on the merits, and your predecessor never raised the argument. Then apparently you come into the case and you raise the argument. Why is it not within her discretion to say it's been waived? I spent all that time working on that opinion, and now you're coming back for a second bite at the apple. And I have the most respect for Judge Capone. I feel she's a well-reasoned judge in all of her decisions. However... Not here. However, even in her first decision, her first decision did not look through in detail, as was required by this court in 1914 in the Inouye Grand Union case, and then again in 1918 in the Hartley v. Eagle insurance case from the New York Court of Appeals. She was required to undergo a specific, robust analysis as to every term within the four corners of the document to determine whether or not this passes muster, whether or not this document is legal. She said that there was a legal contract. My client never raised it, but she never did the analysis. So when she did her alternate holding, which is reviewable by this court, in the second summary of judgment motion, she basically went through the elements only so far as to cite other cases that never conducted this analysis. So we would take the position one of two things, Your Honor. Either you need to remand so we have an evidentiary hearing so we can look at the details of the contract to make sure that this contract, which charges more than 25%, any way you dice it or slice it, and specifically says it's unconditionally and absolutely repayable, making it a loan, or certify these questions to the New York Court of Appeals for guidance, and then we can come back and you have 50 cases below you that will... Now, suppose the New York Court of Appeals comes out your way. What will you do then? Remand to the district court to decide whether under those circumstances it wants to treat it as waived in this case? I think if the Court of Appeals... Or what? I think if the Court of Appeals comes back the way I think they're going to come back, I think they're going to say, A, you can't waive the usury argument, so now we have to look at the decision the judge made to determine whether or not that conformed with the law. Now, the good thing about usury is usury is determined from the four corners of the document, and the waiver... The waiver question in this context, that is whether it's waived in the circumstance of the litigation, isn't that a federal question, a procedural question? Well, I believe that under the CPLR there's a statute that says you can raise an affirmative defense any time... Now you're in federal court. Isn't the waiver question, whether it is waived as an affirmative defense, isn't that a federal question? Well, I think in some respects it could be, Your Honor. Oh, it is. Come on now, it is. And the only question is whether we should decide it, or whether the district court might decide it differently if it fought the merits of the usury law were different from what it was. You know, there are situations in which you send it back to a district court to say, Do you want it? But it is a federal question. That isn't a state question. That's correct. I meant it in the context where you still have New York's public policy to consider to enforce this criminal usury statute versus the federal procedural law that says you waive the affirmative defense. It's federal procedure versus state substantive. I'm not even sure where the courts would come down on that. Thank you. We have your argument. Thank you very much, Your Honor. We'll reserve decision. We'll hear the next case, United States v. Sobers. Thank you. Good morning, Your Honors. May it please the Court, Allegra Glashauser representing Mr. Sobers. Your Honors, on a Monday afternoon, Brent Sobers walked into the subway station wearing a backpack and swiped a student metro card. Three officers surrounded him, taking him to an enclosed area. A student metro card? I mean, if I waive a card, and I'm not a student, have I waived my student metro card? Have you swiped it? Because he's not a student, you see, and therefore it can't really be his student metro card, can it? It's not his student metro card. He swiped a student metro card. The officers didn't know that he wasn't a student, however, Your Honor. All they had was a hunch that he looked a little older. Well, but they did have reasonable suspicion. Come on now. A 24-year-old-looking person using a student card, I mean, is that your argument or is your argument about when they stopped and what they did then? It's both, Your Honor. So a student metro card can be valid up to people who are 22 years old. The officers here pointed to no facts about why they believed that Mr. Sobers They did. They said he looked both ways as though he was about to do an illegal thing. When I go in the subway, I look at the slot to make sure I'm putting the card in. I don't look around to see whether somebody is watching me. That's not what they say, Your Honor. They say the only suspicious thing was swiping the metro card. They say he looked around. They definitely don't say they found that suspicious. They say the opposite, and they pointed to no facts. They said it was not suspicious to look around before you used the card. The officer said the only suspicious thing was using the card. I believe this transcript says A36. That was the only suspicious thing. And they didn't say, importantly, anything objective about what about this person made him look a little older than a typical student. Let's get to the point that is the principal argument about whether, under these circumstances, they had a right to check for the gun in the pack and whether, if they didn't, whether this was automatically discoverable. Ultimately, those were the things that troubled Judge Glasser below and on which he focused. So let's get to it. Yes, Your Honor. There was no reason for the officers. They had no valid reason to search the backpack. Once Mr. Sobers had been stopped by three officers, handcuffed, and the backpack was removed. The officers specifically testified, there was one officer that offered testimony on this point, that he had no reason to think Mr. Sobers was dangerous. None. No concern. They also had no reason to think there was any evidence in the backpack. And the Supreme Court has counseled that the purpose of the search, the scope of the search, must be limited to a legitimate purpose. So there's no legitimate purpose here, and the backpack is also outside of the area that would be part of the legitimate scope of the search. I believe there's an alternative ground here, which is that because he was a transit recidivist, he was going to be arrested. If he's going to be arrested, he's going to the station house. If he's going to the station house, they're going to inevitable discovery. Well, it's the government's burden to show inevitable discovery, which they haven't done here. If he's a transit recidivist, he's not going to get a ticket, right? Well, that's not true, Your Honor. He could get a desk appearance ticket. The facts as far as what his status were are a little limited, as Judge Glasser did not allow counsel to explore the transit recidivist question. But even if he was a transit recidivist, once he's taken to the precinct, the second officer testifies that generally people are given desk appearance tickets in this instance and allowed to return home rather than proceed with the formal arrest process. The government didn't introduce any facts about any inventory process that might apply in that circumstance. And it's not our burden, it is the government's burden to show inevitability, which means there is no— You're saying this is like the Griffith case, that we should send it back to see if there— to have the government come in and show whether there is a practice of looking into backpacks or things when they're inventorying. Because if there were such a practice, and that practice was not manifestly improper, then they would have found a gun. But it's up to them to show that there is such a practice. Is that your argument? It is up to them, but they don't get a second chance to do that now. If they didn't show it— The court found that there were established and standardized procedures. Was there a basis for that finding? No, Your Honor, not with respect— Was this even challenged by defense counsel at the hearing? That is, whether there were— Did defense counsel challenge whether there were NYPD inventory procedures? Defense counsel has no burden to ask the officers about the procedures. The burden is solely on the government to show that there are such procedures, and specifically in the desk appearance ticket context. And defense counsel did raise that and made those arguments to the court and fully preserved them. But you say that they don't get a second chance, but that's exactly what we did in Griffith, didn't we? We sent it back to have the government show whether there was such a practice or procedure. Wasn't that what we did? But we said, as in this case, you were arguing, that they haven't shown it, and so we sent it back for them to see if they showed it. Ms. Monroe? Your Honor, I apologize. Perhaps I can get back to you on rebuttal with respect to that question. But here we have a situation where the government did present what they believed to be sufficient, I assume. It's not like they totally forgot about the issue, or it wasn't pointed out to them that the inevitability of the search or the inventory would be an issue with respect to the suppression here. Moving backwards in the chronology, where was the backpack when he was being handcuffed? What does the record show about where the backpack was when he was being handcuffed? At the moment he was being handcuffed, Your Honor? Yes, and then thereafter. Well, I believe it was taken off right before he was handcuffed, is my understanding, and put, quote, sort of away from him. It was taken off so he could not reach into it. That's why the officer took it off, and so he could not access it. The officer also said it was near his right leg. There's no record about the exact distance between the backpack and Mr. Sobers. But here, there's also the officers had no reason to think that Mr. Sobers presented any type of danger at all. And that is different than all of the cases cited by the government and by us, Blue, Hernandez, Shakir. Those cases all involve situations where officers are investigating serious felonies and have reason to believe the person is armed and dangerous. So there's no question about that part of the purpose of the search. And then the court looks to is the place where the person, the place where it is searched close enough that a person could have actually gotten to it. Here, there's no indication that it is. It's placed away from him so he cannot get into it. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the court, Erin Reed for the government. I represented the government at the suppression hearing in a trial in this case. Beginning with the search incident to arrest question, Your Honors, the judge Glasser was correct to find that the gun was lawfully recovered in this case pursuant to a search incident to arrest because the defendant's backpack was in his immediate control, which is the area from which- But are there any cases at all in which we have done that, the court has done that, where the crime was a trivial one? I mean, it's a crime, but it's a trivial one. One that doesn't suggest violence at all, where the person, where there are not people around, where the pack is taken by the police off a person's back, put somewhere by his feet, and the person is handcuffed. Now, how reasonable is it that anybody would be frightened, think that there was danger from that, which is what the essence of, you know, search incident to arrest. The more interesting thing to me is whether this was inevitable because of the inventory thing, and there the issue is, it is the government's burden, and I don't know that they met it, but then we could send it back as we did in Griffith and say, is there a practice to look into these things, and if there is, then it would have been inevitable. Yes, Your Honor. Well, first, there are numerous cases that hold that the search incident to arrest is just a fact, that you're entitled to perform that search for any arrest if a bag or an area searches within- Well, what makes you say that? Do you have another case where something was searched of this sort, where the crime was this trivial? I mean, the cases I've seen were all drug cases with people who are likely to be violent, and armed robbery cases, all the cases you cite are of that sort. I mean, you know, there are certain issues of privacy. If somebody is arrested because they get a traffic ticket, it's an arrest, but does that mean that you can search them? It does, Your Honor. Under the case law, including the King case, which the government relied on from the Supreme Court, all of the cases that analyze this do not go into whether if a bag or an area searches- They talk about all of the circumstances. All of the cases talk about all of the circumstances, how close it was, whether there were people. You know, they're highly fact-specific cases. And what I want to know is, what are the facts of this case that make it look like the cases that you said, okay? And see, that's different from the issue of whether discovery was inevitable. Yes, it is, Your Honor. But starting with that issue, this case is very similar to Shakir. In that case, like this case, there was a bag that was next to the defendant's leg, and that is what the record established in this case. The testimony was clear from Detective Pashas. It's from A-28. He said the bag was next to the defendant's left leg at the time of the search. So the police can take a backpack and put it by a person's feet so that they can search it. When they could have put it 10 feet further away and then not been able to search. I mean, that's a funny kind of way of doing business, isn't it? I mean, you know, what's going on in these cases is, frankly, that the exclusionary rule is a disaster. And it's a disaster because we always know the person is guilty, and so courts go out of their way to try to find a way why it was okay. But if we left out the exclusionary rule for a moment, would anybody say that there was any danger to any policeman because of which a search of this sort could be impossible? And, Your Honor, in this case, on a narrow subway platform, when the subway could come by at any time, the defendant is standing up and it's a public place, just like Shakir. The defendant could have, it was not impossible for him to reach down and get into the bag. And I understand the court's concern. But when you look at the cases, what's driving the analysis is not, is it likely that the defendant could get into the area of search, but is it possible? And in this case, it was. What about inevitable discovery? Is there evidence in the record of a procedure on inventory? Yes, there absolutely was. The testimony of both Detective Pash and Detective Soto established that there were inventory search procedures that would have been followed in this case. And that had an inventory search been done, it would not have been a ruse for the purpose of investigation. This is very similar to this court's ruling in Lopez, which held that not every detail of a search procedure has to be put in the record in order for the court to say that there was a standard policy. The policy doesn't have to be in writing. In this case, Detective Pash has testified that at the precinct, the entire contents of the bag would have been inventoried for either safekeeping or arrest evidence. And he said, why? He said, NYPD procedures, it's our policy. And Detective Soto said the same thing. When he was asked about what happens at the precinct, he said, the very first thing that happens is that a prisoner is searched and his property is also searched. That's from A52. They're consistent. The argument that perhaps he should have been given a desk appearance ticket instead of being arrested. Well, there's two responses to that, Your Honor. First of all, just like in Cancel, in this case, it's very unlikely. In fact, there's no evidence to suggest that the defendant would have been given a desk appearance ticket. And I think that even though defense counsel on cross-examination, Detective Soto, attempted to get Detective Soto to say that, he didn't say that. And in this case, the defendant was- How do you distinguish the Griffith case from this on the question of the search and the practice and so forth? Because the same kind of evidence was there, and yet our court sent it back. Yes. In Griffith, the question was the search of a closed orange juice container within a bag. And there was no evidence put forth about what happens to closed containers. And in that case- How is- The pack is closed. So just because this is a Russian doll in which there's a doll inside another doll inside another doll, I don't- I mean, is the first doll closed would seem to me to be the question. I mean, I know- I knew that that was the difference. But is it a difference, a distinction that makes a difference, is it? It does, Your Honor. It's obviously a more complicated question, whether officers can open a closed juice container as opposed to just zipping open a bag. My question is, again, is there a practice to open backpacks? The testimony is what they would open was about the same in Griffith. So what's the big deal about sending it back and saying, tell us what the practice is? And if you come back with evidence that it is, then it would have been inevitable. Yes, Your Honor. Of course, this court could remand for that factual finding. I would submit that it's not necessary here. One additional fact is that, as Judge Glasser took notice of, there is an NYPD policy in the patrol guide. And it was appropriate for the court to take that into account, given that that was put into evidence one year before in the cancel case in 2016. That, in addition to the consistent testimony of these two officers about the policy, was sufficient under Lopez. And I just want to note that Lopez goes through all the things that aren't required in order to find that there's a standard policy. The policy doesn't have to be in writing, as I mentioned, but it also doesn't have to be comprehensive. It doesn't have to elicit every officer that does the search, who makes the decision, what parts of a car are searched first. In Lopez, the two officers had conflicting testimony. The first officer said that you inventory every single thing. The second one said only things of value. And even that, even though there was an inconsistency on Lake Sierra, this court found that was enough. And in this case, on RFX, the standard was met. Thank you. Thank you. Thank you. First, your Honor, with respect to any concern of danger, the officer's testimony was specifically that he had no concern of danger. So this isn't even about is the officer's concern of danger reasonable. The officer had none. And that was reasonable under the circumstances here. And that's why it's different from the cases where both search instances to arrest have been allowed and not allowed, but danger is taken into account. The cases that the government mentions about where the scope or the purpose of the search is irrelevant are about searches of the person, not about searches of property that are removed from the person. And Arizona began to make clear that the scope must be related to the purpose. With respect to the inevitable discovery and inventory, in Griffith, there was no testimony about any sort of policy and procedure with respect to the closed container. Here the government put in what they thought was sufficient, that the officer said there was a protocol and there was a procedure. So while this court, of course, can remand for further fact-finding, I don't believe the government thinks that's necessary and nor do I. Why do you think that's not sufficient? He says they vouchered the backpack, they vouchered it for arrest evidence, the contents of the backpack were vouchered for safekeeping, the entire contents were inventoried and vouchered according to NYPD procedures. It's our protocol. Why isn't that sufficient? That's with respect to their procedures when a gun is found and a person is being processed for formal arrest. That's not with respect to when a gun is not found and the officer testifies that most of the time, people even with transit recidivist status qualify for the desk appearance ticket. This isn't enough, and it's not like Lopez where there was extensive testimony about what the procedures were. The issue was down in the nitty-gritty of did this procedure actually follow the precise contours of an inventory search. Here we don't have that. All right, thank you. Thank you. We'll reserve decision. We'll hear the next case. Wade v. Burns, do we have counsel for the defendant? Yes. May it please the court. You may. My name is Anthony Green. I'm from the firm of Winnett Spadafore in Schwartzburg, and I'm here on behalf of the opponent. Now, what this case is about is the state of Connecticut's attempt to exercise jurisdiction over a federal program over the implementation and marketing of the Medicare Advantage plan by... Why isn't this case simply about the fact that you didn't ask for an end in time? You waited more than the time, and your very argument about why this is a federal question is one that would suggest that you would have been able to do this in plenty of time. So why do we get into anything else but just that you didn't do it in time? Your Honor, if this is decided as not being removable at this time, then the time to remove hasn't even begun to tick. So that is one point. But also, in the complaint itself, it's not clear that they're talking about his attempts to market Medicare Advantage plans. It could be talking about attempts to market Medigap plans or other health insurance plans. It doesn't have unequivocal facts that... issue that were in the complaint. So if that is so, then why isn't that enough for you to look and say, this is something that shouldn't be here? Because, Your Honor, there's an exception to the well-created complaint rule when it comes to federal officer removal statutes. And the subjective information of the defendant, or in this case, the respondent, is not taken into consideration. He removed based on information by his own investigation, by his own knowledge of the facts. The complaint itself doesn't provide those facts. What about the issue of the statute on its face as removal from a state court? Yes, Your Honor. With respect to that issue, the plain meaning rule doesn't mean that states get to decide the plain meaning of federal statutes. This is a federal statute. Well, we're going to decide what state court means. Why should it include this kind of state agency? Well, because eventually this... I think it should include this state agency. I know you think so, but the statute doesn't say so. It doesn't say so, but if you look at what the intent of the statute is...  Well, we can look at the civil action definition, and it includes proceedings that are ancillary to what you might otherwise consider traditional state court actions. And this is a case that would eventually be reviewable by the Connecticut Superior Court. So it's not... We can get to the intent unless we find... if we don't find ambiguity in the words of the statute? Well, I think to determine the plain meaning, there's... you have to look at what you believe to be the meaning of the words are. I mean, is there anything... you haven't cited us anything in the legislative history. Now, we all know legislative history is dubious, but if you're going to attack what is the language of the statute, you've got to give us something. The only thing you give us is a very old case that says that some things that are courts are not courts for the purposes of this statute. But how does that help you to say that things that are not courts are courts for purposes of this statute? Well, with respect to federal officer removal jurisdiction, it's a very important public policy from the federal government. And if we allow the states to so easily be frustrated by bringing actions against federal officers... And a statute could be passed to deal with that and say you can remove things from state agencies when some issues of federal... The second question, you say that there are, and that's why I have problems with timing, because you're saying that there are based on how you read this. But if it is such a terrible thing, the statute can be passed. They haven't passed one. But until then, we run the risk of there being 50 new commissioners overseeing a federal program. We run any number of risks until a statute is passed. We run the risk that I may cross the street improperly until there's a statute that tells me I can't do it. You know, that's life. But the policy issues in this case, I would say, are enough to fund that. To cause us to write a statute when we're able? I think that the plain meaning does include something of this nature. And I think that if you really consider the policies and what you define as a civil action as any proceeding to the extent that it seeks a judicial order or a subpoena or testimony or documents, that's what's happening here. So why should this be treated differently? Thank you. Thank you. We'll hear the other side. Good morning, Your Honors. James Cayley, Assistant Attorney General on behalf of the Connecticut Insurance Commissioner Wade. May it please the Court, moving first to Judge Calabrese's point that this removal was untimely. In my view, it's absolutely obvious that this was an untimely attempt to remove an agency civil action to federal court. Mr. Burns doesn't dispute that he was over the 30-day window. Instead, he claims that because removal was based on the federal officer removal statute and the Commissioner's pleading did not provide or alert him to federal officer jurisdiction, that the removal clock was never triggered. However, looking at his notice of removal, at the record of page 832, in bold, it says federal question jurisdiction under 28 U.S.C. section 1331. Okay, so is that a basis for removal? Well, it certainly is. And look at paragraph 47 of that page in bold. The Commissioner's claims necessarily raise a federal issue to which preemption under federal law, the one overriding federal issue that predominates on the face of each count of the complaint. So you're saying that the complaint itself, that Petitioner says, gives ground for removal? Absolutely, Your Honor. And if that is so, why didn't he do it within 30 days? Absolutely, it's crystal clear. And to the second issue... I'm sorry, Your Honor? Is there an issue as to whether the pleading on its face, I mean, the words of the statute, does it enable the defendant to intelligently ascertain removability? The argument is that it wasn't clear, which kind of undercuts his argument on the merits. Absolutely. But why, I mean, Judge Haidt went ahead and dealt with it. Judge Haidt, from Judge Haidt's perspective, certainly the federal preemption issue was not bona fide because there is an exception for state licensure. To the point of the timeliness... Yes, Your Honor. Can you tell right away that there is federal jurisdiction, or does it take you some time to intelligently ascertain it? And if it takes you some time, does that give him some additional time on the 30-day clock? Your Honor, it doesn't take any time. Again, going to paragraph 47... Your argument is that no one looking at this could intelligently ascertain that there's federal office or jurisdiction. No, and Your Honor, Mr. Wade claims that it's obvious, too. Look what he says in paragraph 47. On the face of each count of the complaint, he says that there's federal preemption. So if Mr. Wade is saying that there's an obvious federal preemption issue here, then certainly he can't stand here and deny it. You're in the difficult position of saying that every one of these arguments is a bad argument. That if it were a good argument, it would be obvious on its face. That's right, Your Honor. But basically looking at the complaint, when we see that this involves Medicare-related insurance products, we don't see beyond that, which is there's a carve-out in Medicare for state licensure. It's only after we do the research that we find that there's not a jurisdictional issue here. Now, just briefly, because he raised it, we have a plain meaning rule issue with respect to the meaning of the word state court that's used in the Federal Office of Removal Statute. And counsel for Mr. Burns is at length arguing that the court should have considered certain federal interests in making that plain meaning rule analysis. But we don't do that. We just simply look at whether or not the word used by the legislature is clear and unambiguous and whether or not the term is used within the statutory scheme in a coherent and consistent manner. And that is, we don't look at any interests. We don't look at any interests unless this court were to choose the functional approach in examining the meaning of the word state court. And because it wasn't in my brief, I just want to, to the extent the court even reaches this, there is a case from the Second Circuit from 1985 entitled Friends of the Earth v. Consolidated Rail Corp. It's 768F2-5762, Second Circuit, 1985. And in that case, in construing a different provision of the Clean Water Act, the court specifically rejected the functional approach. And Volkswagen v. Puerto Rico, which is the First Circuit decision, which speaks at length and adopts this functional approach, this court specifically rejected the functional approach in construing the term state court in that statute. Other than that, I believe I've addressed the arguments raised by Mr. Burns' counsel. I'm happy to leave the remainder to my papers. If you have any questions, I'd be certainly interested in answering them at this time. Thank you. Thank you, sir. We'll hear the rebuttal. Thank you, Your Honor. I just want to make the point, first of all, that removability and timeliness are two separate issues. It could be removable, but the time to remove could not have started ticking. That is possible. There are cases in which that's recognized. Why was this timely? Why was the removal timely? I don't believe that the clock to remove has ever started. Why didn't it start? In your removal papers, you identify the grounds for removal. Why wasn't that apparent from the first day you saw the pleading? That was based on his application of his own subjective knowledge and his own research. It wasn't based on anything that was said in the complaint. You said, in the face of every count. Correct. Mr. Burns, at the time, was poor say, so perhaps he phrased it not as artfully as it should have been. He should have said, I didn't see it. He was saying, it's right here. Because that's what it turned out the allegations were all about, was about his marketing of Medicare Advantage plans. It's the federal program making it a federal question and removal. Thank you. We'll reserve the session. Thank you. We'll hear the last case to be argued, Lynch v. Vaccaro. Thank you. Good afternoon, Your Honor. Could you lower the microphone for the deus? Okay, is that better, sir? Thank you. Thank you. May it please the court. Due process is squarely rooted in the provisions of the U.S. Constitution. It is, in fact, the heart and core of our judicial system. The Fifth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. Due process requires notice and an opportunity to be heard. In addition to the constitutional requirements of due process, Section 112 of the Bankruptcy Code specifically requires notice and a hearing for a motion by a party in interest to convert or dismiss a Chapter 11 case. It has been established in numerous instances that the bankruptcy court judge is not considered a party in interest for the purpose of a motion to convert under Section 1112. In this instance, and as the court record clearly supports, there was no notice to be heard on June 28, 2017, when the bankruptcy court abruptly and surprisingly converted the Chapter 11 case to one under Chapter 7. The June 21, 2017, scheduling order was very specific, and it made no reference to the conversion issue being on the court calendar. And, in fact, the June 28, 2017 transcript, it's in the record at page A553, reflects the court statement regarding the issues that were going to be on for that day, which were the hearing on the debtors' 1919 motion, as well as the motion to limit notice on the disclosure statement, and the Wells Fargo stay release, and the status on the Frank claim objection. There's no reference at all to a motion to convert or dismiss the Chapter 11 case. However, the case was converted that day. Within 48 hours of the conversion order being entered, the Chapter 7 trustee seized possession of approximately $700,000 of cash that was in my debtor in possession account, including approximately $30,000 that were exempt assets in the form of tenant security deposits and child support income. And additionally, so I was deprived of my property, and the legitimate unsecured creditors of the estate were deprived of their right to receive payment under my 100% plan that had been submitted to the court. Section 1112F also mandates that notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter. You're out of time. Yes, sir. You're out of time. The red light means you're out of time. You have saved two minutes for rebuttal. You can use it now if you like. Or you can hold it for rebuttal. I just want to quickly say, then, that in the appellee's papers, they do not point to anything in the record indicating that there was notice about this hearing being on a motion to convert or dismiss. They do not challenge the mandates of 1112F, and they do not point to any place in the record where the court led an independent duty to do an analysis on conversion or dismissal. It simply just did not happen, Your Honor. Thank you. Your Honor. If you may please the Court, Your Honors. David Blansky, LaMonica Herbst, and Menescalco, appearing for Arkans-Barnard, the Chapter 7 trustee appointed upon conversion. Your Honor, the principal points raised are one, raised for the first time before this panel, is whether the bankruptcy court had authority to respond to essentially convert the case. And while the cases cited by Ms. Lynch are correct in 1984, the briefing overlooks that in 1986, Section 105A of the Bankruptcy Code was amended expressly to address this so that a bankruptcy judge can have the ability to provide for any relief that would otherwise be available to a party in interest. And thereby it overruled the two prior cases cited by Ms. Lynch that said that a bankruptcy judge did not have that authority and only had a motion of a party in interest. And that provision states as follows. Under 105A, as amended in 1986, it says at the second sentence, no provision of this title, as in the entire Title 11 Bankruptcy Code, providing for the raising of an issue by a party in interest, shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules or to prevent an abusive process. There was a request for conversion in any of that, I thought, in the record. In any event, I believe at least in three submissions made by Mr. Vaccaro, the former spouse, he requested that relief. The U.S. trustee supported it on an argument on the order to show cause. But even absent that, by statute, by clear meaning, it overruled the two 1984 cases, including the Second Department decision in that regard. So there is no doubt there was authority. What's interesting is one of the cases cited by Ms. Lynch actually stands for the proposition outdated by the amendment. That one, a party in interest had to make the motion. That was corrected by 105A amendment. Two, in fact, an oral motion would have been adequate even under that case. And three, I think that case spoke to that conversion can be without a hearing. And there's authority for the proposition that a hearing is not required. But that's not what happened here. Here, the court did not abuse discretion in converting the case. As the court observed, an extensive amount of time had passed, 18 months, and the state was in worse condition than it was before. Now, one of the questions raised by Ms. Lynch is was there notice that there was going to be a hearing? Let's start with there were four separate orders entered during the life of the case that expressly said, in the event of a failure to file a disclosure statement, obtain approval of the disclosure statement, and confirm a plan by deadline set by the court, the court will, without a hearing, either dismiss the case or convert the case for cost. Four separate times. It was stated on the record at least two or more hearings as well. Now, what happened here is that the order shall cause hearing was initially set down, a settlement was announced, and then the debtor, upon reflection, elected to withdraw from the settlement. That order shall cause about conversion was continued by docket entries initially to June 14th and then to June 28th. It was not marked off the court's calendar. So if the court takes judicial notice of the calendar looking at the interim dates, it will see that the order shall cause concerning conversion and the hearing conversion was not dismissed, was not discontinued. A matter of record, it was continued. And debtor's counsel, a third of the time, would have notice of that fact. So the notice issue is a red herring here. It was very clear about the consequences would be about a failure to comply. And here, every operating report showed that this estate opted rated as a deficiency, that there was insufficient funds, that mortgages had not been paid for at least in one instance 77 months, including pre- and post-petition. So the estate was being diminished as the equity eroded. And also what's happened here is that there was no ability to confirm a plan. Here, there was a deadline of less than 30 days left in which to confirm a plan. You have to confirm the disclosure statement before you can send out the plan to the creditors, and the judge trusts that an immutable deadline, as he put it, for less than 30 days away. It was an impossibility. And finally, what the court should note is, one, the trustee has been in place for two and a half years. He sold liquidated assets, attacked claims for adversary proceedings. You cannot unwind what he's done by hypothetically reconverting the case because you can't undo a sale. There are certain actions undertaken that won't provide for that. And finally, Mrs. Lynch, I stand corrected, has a pending Chapter 11 she filed subsequently. If you reverse the order and send it back down to be converted back to Chapter 11, she will then have two pending Chapter 11 provisions, something that's not contemplated by the Bankruptcy Code. In a Chapter 11 case, a debtor should contribute her disposable income to pay the plan. Which plan do you play? Which creditors get paid, the ones existing in the future, the second case, or in the first case? It's not contemplated by the code and would result in a manifest injustice and abuse of the Bankruptcy Code. For these reasons, we believe the conversion order should be affirmed. Thank you. Thank you. Mrs. Lynch for her rebuttal. Thank you, Your Honor. Mr. Blansky makes reference to a 1986 change regarding Bankruptcy Code Section 105A to address the judge providing any relief as required. Taking court orders or rules are to prevent an abuse of process. However, 105A does not allow the judge to enter orders that deprive a party of their rights under other sections of the code. And it is to prevent an abuse of process. And in this case, there was no abuse. In fact, Mr. Domeno has stated on the record a couple of times that there was no misconduct by the debtor. Mr. Recaro, contrary to what Mr. Blansky said, did not request this motion. And as far as the 18 months into the case in worse condition, that's simply not true either. The case had a massive surplus, millions of dollars. There was only about $225,000 to $250,000 of unsecured creditors. And there was millions of dollars of equity in the state. So the state was not by any chance being diminished. Regarding the four previous orders about a confirmation date, those are not applicable because where the court did set those dates, then through intervening events and other agreements and other orders, those dates were extended. So it's not that I failed to meet the date. Things happened, and so it was changed. And as far as the last date being immutable, that was not the case either because when it came to the ill-advised 9019 with Mr. Recaro, the court was willing to extend the dates then again. But that 9019 was going to be only for the benefit of Mr. Recaro and not for the benefit of any of the other creditors. A calendar docket entry does not put all of the unsecured creditors on notice, and they absolutely did not have notice. And I was not aware that that date was going to turn into a surprise conversion. And a 100 percent plan can be confirmed. In all the research that I did, I haven't found any instance where a 100 percent plan could not be confirmed in an individual Chapter 11. Every creditor was getting 100 cents on the dollar, lump sum payments. That is a wild success by all measures, especially with all of the difficulties I had to deal with, not being able to operate as a debtor in possession up to 10 months into the case, burdened with excessive administrative fees related to the state court receiver who should not have been in possession of my property to begin with. And as far as things being unwound, the sale is under appeal. There's nothing else that the trustee has done that presents any kind of complicated situation. And regarding the second Chapter 11, that was dismissed on 8-29 by Judge Truss. And in that case, too, there was no instance. There's never been any instance in either case that I have been engaged in any misconduct or that I have been trying to abuse the process. On the contrary, unfortunately, my husband, Mr. Vaccaro, has filed repeated false statements, false affidavits, committed perjury, and has frustrated my ability to move forward. I was trying to preserve the assets so we could go back into state court and settle out the things we were doing throughout Judgment of Divorce, but he kept throwing roadblocks in the way. Thank you. We have your argument. We have your papers. And very well done today. Thank you very much. And the last case is on submission. We'll adjourn. Thank you.